All rise. Hear ye, hear ye, hear ye, this Honorable Appellate Court of the Satin District is now open for someone to adjourn. The Honorable Anne Bradford Jorgensen presiding. Please be seated. Your Honor, this is the first case of the morning called 212-446, Village of Mundelin v. Oscar Garcia. On behalf of Mr. Garcia and Ms. Kathleen Hamel, on behalf of the village, Mr. Lawrence Carlisle. Good morning, Your Honors. I'm Kathleen Hamel, representing Oscar Garcia. Mr. Garcia stands convicted of driving while under the influence of alcohol and also a violation of a Mundelin ordinance prohibiting consumption of alcohol by persons that are under 21 years of age. Oscar was 18 years old when this happened. Our contention is that the state did not prove him guilty of driving while under the influence. We framed our contention as a violation of the corpus delecti rule, which requires that the prosecution has to establish without a reasonable doubt one that a crime was committed and also to the identity of the offender. Corpus delecti cannot be proved solely by a statement, an admission, a confession, an out-of-court statement made by the defendant himself. There must be in some things more evidence independent of the statement, which corroborate, tends to show that in this instance that a crime was committed. What was the statement that violated the corpus delecti rule? Well, the statement that we have here, it's the only evidence that tends to show that the defendant may have driven prior to his arrival at the park, and that was his initial denial to Officer Bush. Wait, no, there's no question he was driving. He did drive. There's no question he was driving, and there appears to be little question that he at least had consumed alcohol in the park. The question is whether he consumed the alcohol before he drove. And initially when Officer Bush asked him, were you drinking in the park, he initially said no. The corpus delecti rule, the evidence does not have to rise to the level of proof beyond a reasonable doubt or even establish all the elements. That's correct. It only has to tend to establish that the defendant's statements are in some way corroborated or tend to show that the statement was truthful, not the result of coercion or psychological. That's right. So you have driving and you have evidence of intoxication. Why isn't the corpus delecti rule met just by those two simple facts that all they have to do is tend to corroborate? They don't have to fill in all the gaps. Well, it's because we have nothing that tends to show that he consumed alcohol prior to arriving in the park. We really can't tell when he consumed the alcohol, and we do have a statement that he made. Correct. And why not just focus on the lack of evidence of impaired driving, the sufficiency of the evidence instead of getting into whether or not he consumed the alcohol? Well, I framed his corpus delecti because the facts are so strikingly similar to the Flores case that I cited in my brief, and it was decided on that basis. The exact same thing where there is a, actually it's a little more extreme than ours because there actually is evidence of bad driving there. The accident is prima facie evidence that there was some bad driving. Yes. Now, in this case, there wasn't even necessarily bad driving. There was somebody who had an unfortunate incident. He pulls into a curved driveway, and it finds after he's gone around the curve that he is blocked and then has to back out. What about the fact that he did not remain there after hearing the message, call the police? Well, there actually isn't any evidence that he heard that necessarily. Well, he was in close proximity. Assuming he did. The other workers heard it. Assuming he did. I think his, under what authority would a public works employee be able to detain a person at a scene that isn't even an accident scene? Now, had it been an accident scene, then he would have had a problem. Well, it's property damage, isn't it? Well, there really wasn't any. The public works person himself said that all that he did was back out of his car, went into bushes, which then stood back up. So there was no damage. He also said the public works employee said there was no need to replace anything or do anything about it. Isn't there some evidence still of erratic driving? I see your point. This isn't the classic weaving around, hits an object, and then backs out and takes off. There was some evidence that he took off at a high rate of speed. He was spinning his tires. He goes for McDonald's. So, I mean, ostensibly there's some evidence of erratic driving at some level. Well, I think it's not the sort of, I guess, to back up a little bit on the tending to show, evidence which tends to show, I think that term refers to support some inference. For example, I bust law on that because I thought maybe there was a definition somewhere. There wasn't expressly. However, I notice it's used often in the, when there's a discussion of evidence of flight, where they say evidence of flight tends to show a consciousness of guilt. Now, that implies to me that it has to at least support some inference, independent of the defendant's statement or anything else. And so when you see somebody leave a driveway after having had a frustrating experience inside of it and after having had an unpleasant confrontation with an irate public works employee, a person will, you know, leave a driveway. I think that's very plausible. Here's what I think the crux of this case is. Because the evidence established beyond a reasonable doubt that the defendant was under the influence at the time he was driving the vehicle. I think that's really where the rub is here. There's a line of cases, I believe, however, as you know, where somebody is seen driving, later on after that is stopped, is inebriated. Most convictions have been upheld. Usually there's an accident involved. So what takes this case out of the line of cases that say you don't have to stop the person, see the person in the actual act of driving before you can arrest them for DUI? How does this case take it out of that? I think there's two things. One of them is the utter dearth of any evidence that, any affirmative evidence that he drove as if drunk or even that he was drunk during that encounter or under the influence during his brief encounter with Mr. Earle, the public works employee, when he said, what are you doing? Earle claimed he wasn't close enough to the defendant to smell alcohol, but he was in this 14-foot wide corridor of these two hedges with a cattleback in it and presumably not pressed against the other side. He was pretty close. We certainly see many cases in which police officers claim that they could smell alcohol from that proximity. And he didn't slur his words or anything else. Certainly he would have no motive to protect a defendant at that point, obviously. Right. You see what you're doing, though? You're taking each little piece of evidence and arguing the inferences. And we are not here to retry the case. We're to look at all the evidence and determine whether or not a reasonable fact finder could have found the defendant guilty in looking at the evidence in a light most favorable to the state. And you're taking each piece and saying, well, look at this, look at this. That's not our function. Well, no, what I'm doing is I'm explaining the absence, and not only the absence of evidence, but there is this little evidence there is which supports, gives rise to a single inference, that there was nothing wrong with his driving, that he wasn't driving under the influence, that there was nothing that would corroborate the claim that he was driving. What about the state's argument concerning his blood alcohol level that was, I believe, a .073? Well, the state itself, in its case, somewhat gratuitously from my point of view, introduced a DVD of a recording of the defendant's interactions with Officer Bush at the police station afterwards, during which Oscar explained why he initially denied having drunk at the park and said he, in fact, had drunk at the park. It appears that Oscar, 18 years old, was, in fact, violating an ordinance that prohibited drinking by people who are under age 21. When he confronted Officer Bush, his initial reaction was to lie and say he wasn't drinking in the park because he thought that's what the crime was. He said on the recording, I said so out of fear. But he also explained he was drinking in the park, that he had brought some hard liquor in, that he'd walked to the back of the park and he'd, as he called it, binge drank it, which, you know, sounds horrible, but it's not unusual among 18-year-olds. He chugged some of this hard liquor. He saw Officer Bush, and he threw the bottle in the creek. How long after the encounter with the public works employee did this happen? Was he confronted by the police? The time thing in this case is a little weird, but it appears to me that he had at least 5 to 15 minutes to get to the back of the park and binge drink. This is because we have a third public works employee who follows him to the park, also with no comment that he drove badly, sees him park, says the parking's okay, and sees him, sees Oscar and a companion get out of the car and start walking into the park. He then, the public works representative comes out of the park. He's sent out an alert to the police that it was in the vicinity, and he sees Officer Bush pulling into the wrong park a few blocks away. So he has to drive up to there and tell Officer Bush, you're in the wrong park, Officer Bush should come to town. What I'm saying was about the time. Well, this is it. I'm explaining the time. Did anyone ask him what time was it when the initial encounter takes place by the Cadillac? What time was it when you got to the park? No, the time is vague. So it could be as little as 3, 4, 5 minutes, or as much as 15. That's the answer to the question? So it's 5 to 15 plus this time that it took this third employee to get to the second park, tell the police officer he's in the wrong park, and then for Bush to drive back to the proper park, get out of his car, ambush them. He got out and he looked at the defendant's car. He saw that there was some faint scratches, you know, the kind of things that you would have left on your car if you backed into bushes and some evergreen needles that appeared to be from the hedge. And then he walks around the park asking people, have you seen anybody that got out of that car? Now, he says that was, it took him 5 to 15 minutes to do that. Now, by this time, surely the defendant reached the back of the park by the time. And how much longer after that? We've read, we know the facts. What's the time frame from the first encounter with the police officer to when he takes the breath test? I guess we would have to include the time that it takes to drive from the church. Well, assuming it's whatever it is. Yeah. It's a short period of time. It's within a half hour. Yeah, it's within a half hour. I think that's fair to say. The encounter at the church to the police officer arriving within a half hour. That's fair to say. How long from the first encounter with the defendant where he's, the first conversation to when he takes the breath test? That appears to be, I think they said the police station was, you know, I'm not sure I recall how much time it takes to get from the park to the police station. But it would be that amount of time. Plus the 20-minute observation period. Yeah, right. So probably another half hour, 45 minutes before the breath alcohol test. Yeah. So you have about somewhere in the nature of 50 minutes to an hour or so. There's no question but that he consumed alcohol. The question, again, is did he do it before he drove the car? And, you know, when you think about it, when Bush arrived at the police station, at the park. Was there any evidence about how much it would take for him to drink to get to that level within the hour? No, there was not. No expert testimony on any point about, you know, reactions to alcohol or anything else. Just based on common experience, couldn't the trial court infer that the defendant's statement that he guzzled all his booze in the park is not credible, and that he was likely drinking before he arrived at the park? I don't think so. Was there any reasonable inference from that? No, I don't think common experience would let us know how alcohol might affect one 18-year-old. Is there any indication that he threw up after chugging a water bottle full of a clear liquid? There was no, he didn't say anything about that one way or the other. We don't even know what type of booze it was. Not really. I think he, at some point he said he mentions vodka, but I don't even, I don't think he tied that necessarily to what it was he was drinking. Well, he said he was drinking the night before with some friends. Yeah, he did. But because when Bush arrived at the park, he didn't see the defendant, we know that this 5-15 minute period that he spent looking around for him was a period of time during which the defendant was already in a place where he could be chugging this liquor. So there was time for him to do this. His story makes sense. But the thing is, the burden of proof is on the state. It is not on the defense. The state had to prove, come up with some evidence that tended to show, which I believe means gave rise to an inference that he was driving while under the influence. At the time he drove. At the time, yeah. When he was in the park, he was with a companion, a girl. Was she in the car with him at the church encounter, or was he alone? Nobody said. Yeah, the evidence or the mention of the young woman was very fleeting in this trial. Did the police impound the vehicle? I don't think that's on the record. Did they allow the girl to drive it away? There's no evidence of that? No. I hadn't even thought about it, but you're right. The village didn't fill in those gaps? Right. And again, how does this distinguish from the cases? The police come upon a driver. There's an accident. They don't witness the accident. They don't see how it happened. They don't know anything about what happened prior, and those convictions have been upheld. How do you distinguish this case? Well, I think in those cases, generally, the defendant is near the scene, and he's clearly drunk, approximate, to the car, and there aren't intervening events, as there were here. There isn't an intervening opportunity for him to have been able to drink. So if you guys have no more questions. Thank you. Okay, you'll have a chance to reply. Thank you. Yes, and we do ask that you reverse this conviction. Please, Mr. Senator, the court. My name is Lawrence Maldon Zurn. I represent the village of Munlaw in the appellate in this case. I was also the trial counsel for the village as well. The court, it's apparent, is well-versed on the record, as is the trial court. The court had the opportunity to both hear the testimony of the witnesses that were presented by the village and do two videotapes. One was an on-scene encounter with Officer Bush in the park and back at the Munlaw Police Department. Counsel has raised the issue about the corpus delicti and cites the Flores case as being close in point as to the facts in this case. But I think there are some specific differences in the Flores case, which are very critical, which don't exist in this case. The court has obviously had a lot of concerns about the timeframe as to when this incident with the church happened, when the defendant was found in the park. And in the Flores case, the officer gets called to an accident. He's called out about 8.05 p.m. He arrives. There's nobody in the car. There's evidence of an accident. He is preparing an accident report when he sees the defendant stumbling towards the car. He asks the defendant two questions at that point. He said, is this your car and did you have an accident? And he says, yes. He asked him if he had anything to drink since the accident. And was this your car? He said, yes. He had nothing to drink since the accident. At the station, he's Mirandized and the defendant is asked, did you drive the car and did you have an accident? He said, yes. He's never asked again, did you, in fact, drink after the accident? The court in that case appeared to have some trouble with the officer's testimony because at the trial, the officer testified he made no notes, made no report about asking the defendant if he had drank after the accident. He testified he was recalling an independent of his police report. The defendant testified at trial that he denied that the defendant was asked the question if he drank after the accident. In fact, the defendant denied drinking after the accident. Actually, denied drinking before the accident. He said that he had parked the car at 7 o'clock. He had gone into a party where he consumed tequila. He had had the accident on his way to the party trying to park there, and then he went out to his car about 8 o'clock to get something out of the vehicle, at which time he was confronted by the officer. In addition, the defendant's testimony that he had consumed alcohol after the accident was corroborated by the host of the party who said he had arrived at 7 p.m., consumed alcohol at the party, and left at 8 o'clock. We don't have that same issue of corroboration here. Let me ask you this question, and we've read the floor and we're familiar with the facts of this case. You say in your brief that there's nothing in the record to corroborate the defendant's statement that he consumed alcohol in the park, but isn't that textbook burden shifting? You have no evidence, unlike Flores, where there was some evidence by virtue of the accident that there was some bad driving. No evidence, or at best marginal evidence, of impaired driving. That's your obligation to prove that the defendant was impaired at the time he drove, beyond a reasonable doubt. It's not the defendant's burden to prove when he drank. I would agree with that statement. The defendant made numerous statements throughout the course of this encounter, both at the park and at the police station. The defendant, in their brief, seemed to indicate and said there was no corroboration for his statement that he drank the night before or that he had not consumed any alcohol after the accident. And pointing out that, unlike the Flores case where the defendant denied being asked about drinking after the accident, the statements here aren't in dispute. We don't have the defendant recanting his statement here. We don't have the defendant saying, I didn't make a certain statement that was attributed to me by the officer. We have the defendant making a different statement. He initially denied drinking twice at the park. He then said he drank the night before. Again, the defendant, his conviction for underage consumption of alcohol stands. Right. We're talking about proof of impaired driving beyond a reasonable doubt. All the evidence other than this, I would call it marginal evidence, the squealing tires and leaving in an erratic, quote, unquote, erratic fashion. Other than that, you have zero evidence of impairment while he was driving. Well, I would disagree with the defendant's assertion that this was minimal driving. What is the, other than the evidence that I just mentioned, what's the evidence of impaired driving? You have the workers saying that they saw no weaving, no signs of impairment. What's the evidence of impaired driving? Well, I think you need to look at the testimony of Mr. Earl more carefully and see what his testimony about the driving was because he says he was nearly behind this hedgerow when he hears squealing tires. He sees the defendant's vehicle coming into the driveway there. Now, two things about the squealing tires. There's two incidents of squealing tires, leaving marks on the sidewalk here. So this isn't somebody as has been characterized by the defendant that he simply got caught in a tight driveway and couldn't turn around. The witness, Mr. Earl, testified he hears squealing tires. Not only does he see the defendant coming through the driveway at a high rate of speed, he's driving on the sidewalk. He comes up to, it's a four-foot wide sidewalk, and Mr. Earl testifies that the driver's side of the Cadillac is brushing along the hedgerow completely on the sidewalk. He then drives further down the sidewalk where the driveway has a vehicle parked going in the opposite direction. He then can't get along there. He tries to drive along with the passenger's side of the tires along the second hedgerow on the west side of that driveway. He then... Let's say, we're familiar with the record. Right. Let's say this. Mr. Earl is not a public worker. He is a police officer. And something about the vehicle, the officer hears something, and then he decides he's going to give, he's going to follow this vehicle to see if there's anything more that will solidify or corroborate his suspicion that the driver might be impaired. So he follows him for a period of time, whether it's a block or two blocks or three blocks, sees no evidence of impairment, yet he stops him anyway. What would we do with that case if there was a motion to suppress? Well, I think the case law is clear. If, in fact, that initial encounter established probable cause... Well, it's not that there's no probable cause. That's just something that someone hears. He didn't even see the vehicle squeal. He doesn't know if it's that vehicle or some other vehicle. Well, Mr. Earl didn't hear the initial squealing of the tires when it came into the driveway, but he did testify that when a defendant's vehicle encountered the parked car on the other end of the driveway, he put the vehicle in reverse, squealed the tires going backwards, which he heard. He didn't see. I would disagree respectfully that he testified that the vehicle came back towards him and he was on the other side of the hedge, which he describes about being two foot in depth, that the vehicle in the trunk of the Cadillac came all the way back, pushed the entire hedge down, didn't break it. Again, was the vehicle on the roadway at that point? The vehicle was not on the side. Okay. So, again, go back to what I just said. Take your what would we do with that case? The vehicle's not on the roadway when this happens. There's no accident, but the police officer, acting on a hunch, follows the vehicle for a reasonable period of time, sees no other evidence of impairment, no other traffic violations. Wouldn't we be duty-bound to suppress the evidence or to affirm the suppression of the evidence? No, I don't believe that you would. I think that there is sufficient evidence. What was encountered? What's the violation? What's the violation? To support the stop. Illegal squealing of tires, perhaps reckless driving. What provision of the code prevents you from squealing tires when you're not on a public highway? Well, Section 11, I believe it's 505. Is it squealing tires in a parking lot? Is that a violation? Well, under the vehicle code, as the court well knows, these violations of the vehicle have to occur on a public highway with the exception of Chapters 4 and 5, which is leaving the scenes of the accident, driving under the influence of alcohol, open transportation, alcohol, drag racing. So all those offenses could be committed on private property. So that would provide the officer. If, in fact, the court found that the squealing tires did occur on private property, that would provide a basis for making a traffic stop, and I think probable cause to make an arrest. Counsel, let me ask this. Earl had an encounter, obviously. He spoke to the defendant at the scene by the hedges, correct? Correct. Did he observe or do he opine there were any obvious signs of intoxication, slurred speech, glassy eyes, anything that would indicate there was impairment at that point? I think Mr. Earl testified rather candidly that he didn't get close enough to the vehicle. The testimony of Mr. Earl was he was behind this hedgerow. When the vehicle backed into it, when he reversed, Mr. Earl walked around the hedgerow, stood in front of the vehicle to keep the vehicle from leaving the scene. He then said he walked to the driver's side and made some comment to the effect of, what are you doing? The defendant said, I'm sorry, I apologize. He was asked on cross-examination by the defendant's counsel, said, did you smell any alcohol? And his response was, I wasn't close enough. Let's assume that's true, though. But he did have some brief conversation with the defendant. Did he indicate that there was slurred speech, anything about the defendant's speech or actions at that time that would give any indication of impairment or intoxication? No, Mr. Earl did not indicate that. And the only statement that was made to him was, I'm sorry, sir. So there was no conversation. That was it. It was then at that point when he told the defendant to wait there and he got on his public works radio to have one of his assistants. And the defendant took off. Right, he took off at that point down the park there. Okay, the bottom line here is, where is the evidence of impaired driving? Of impaired driving? I think the impaired driving is what took place in the church parking lot. That's it? Well, that was the only thing that was testified to. Well, that would be all we have is what's in the record. Yeah, that was all in the record. He was squeezing tires and he went on the sidewalk. Driving on the sidewalk, backing into the hedge. If you can picture a two-foot hedge, which is about the depth of this podium, and this vehicle is backing up at a high rate of speed and Mr. Earl is right behind the hedger, I think that that could be considered reckless driving. He's endangering the safety of the person being Mr. Earl. Wasn't Mr. Earl, didn't he say he was squatting down? Initially. Right. So would it be a reasonable inference that the driver wouldn't have known he was behind the hedge? When he pulled into the parking lot and he's going with his front end of the car along the hedge, that's when Mr. Earl stood up. Now, there was no testimony that they made eye contact or anything at that point. When the defendant backs up the car there, again, there was no testimony that the defendant knew that he was behind there, but Mr. Earl was. So, again, getting back to it, it's the squealing tires and driving on the sidewalk in the parking lot. Right. And squealing tires should make sense to leave tire marks. As counsel said in the briefing, low air could cause a tire to move. Squealing tires is impaired driving? Well, due to the rapid acceleration. That's what the violation is. I know how you'd leave a patch. But my question is, is that in and of itself impaired driving? Is that indicia of an impairment as opposed to being in a hurry? No, I think it is impaired driving. Because? I'm sorry? Because? Because the defendant has characterized the driving as somebody being, you know, I got stuck going the wrong way and I got stuck because there's a car blocking my drive, so I have to back up. Most of us as drivers, if we're in a closed encounter, we're going to back up slowly. We may be backing up, moving forward, backing up, moving forward. This driving was not careful. It was. No, no, impaired. Not the absence of care. Well, I think that the. . . I mean, just as though we do not rejudge the facts. I'm not here to decide whether he was careful or not. I'm here to decide whether or not there was proof beyond a reasonable doubt that he was impaired when he was driving. Where's the impaired driving? Where's the bad driving? Keep going back to squealing tires, and I'm asking you to connect that to an impairment, not a lack of care, or maybe you and I wouldn't do that. Well, I think the impairment is the manner in which somebody tends to drive there. Okay. You make a decision how you're going to extricate yourself in that situation, and he's obviously done that. And you combine that with the fact that when he's told to wait there and he's calling on the radio and then the police are going to be on their way shortly. And, of course, what authority does a public works employee have to restrain my actions? I don't think he had any authority to restrain you. But just as if somebody was to drive into your front lawn and you come out and see that a tree of yours has been run over and you said to the driver. The hedge wasn't run over, though. The testimony was the hedge popped right back up. If somebody were to drive into your yard for whatever reason, maybe they don't cause any damage, but they're in your yard, and you were to say, wait right here, I'm going to call the police, I don't think the public works employee had any more authority as a private citizen to say you have to stay here. And we're not saying that that was a separate offense by disobeying the direction of the public works thing, but it was believed to be that there was some damage, although minimal, to the hedge that would have required him to have stayed there, and that was why he was originally charged with leaving the scene of the accident there. But when you're talking about the impairment and whether this defendant drank after the fact, I think it's significant that knowing that the police were being called, that he would drive to this park and then commit another violation. If you believe the statement that he drank in the park or drank after he was at the church, that he would then go and commit this offense. You could reasonably suspect that maybe the police had been called and were looking for him. He went to a place where there was a girl in the car. Do we know anything more about the girl? Was she in the car with him at the church or not? Or did he meet her at the park? I can tell you there's nothing in the record to indicate whether she was in the car or not. And that's what we'd have to go by. Right. You don't want to speculate. Right. Was his vehicle impounded? Again, I can tell you there was nothing in the record about whether it was not. Well, you were the trial prosecutor. Well, I can tell you, Your Honor, that I know what happened, but I can tell you it's not in the record. Okay, it's not in the record. I mean, the policy is to tell all the details. Did the state have the identity? Did the village have the identity of the girl that was in the defendant's company? There was a reference, if you watch the video back at the police station, that Officer Bush made some reference to his passenger. He said, I don't remember what her name was, but he said, we talked to her. But the state didn't call her to either corroborate or to refute the defendant's story. She was not called as a witness. And I think, again, going back to what the standard in which the court has announced at the beginning of the argument here, it is just so unreasonable that this verdict cannot be standard. And I think that the trial court, being an experienced trial judge, having seen this, having watched the two videos which this court has seen, reviewed the testimony, to observe the defendant at the station, at the stop, and to hear the testimony, I think there was sufficient basis in the way it was favorable. I think the verdict should be upheld. Thank you. Do you wish to reply? I just wanted to make two points, one being that driving poorly or navigating, misnavigating an unusual place like this driveway, this curved, hedge-lined, narrow driveway, is remarkably different than driving abnormally on a regular roadway. And the inferences of must be drunk do not arise when somebody is simply trying to get themselves out of a tight spot with their car. And there's another car blocking. Yeah. And I think it's notable that he did succeed in turning his Cadillac around in this narrow space. And Mr. Earle doesn't say it was like a 47-point turnabout or something like one might expect from an inebriated person. It seems to have been rather efficient. The other thing is the counsel's argument that, well, you know, he didn't stay in the driveway after Earle started yelling to people to call the police, assuming he heard him do that. I think of a situation where maybe two neighbors are having an argument, you know, between their yards over something and it starts getting heated and one of them turns around and yells to his kids, go out of the house and call the police. Would the other person feel like they needed to then remain there until the police came? I think they'd be likely to just stomp off themselves. And I think that's what the defendant did with his car. Well, he also said, I'm sorry. He did say he was sorry. He did say he was sorry and then he left. Probably very embarrassed and upset over this encounter. So for all these reasons and for those that we've expressed in our briefs, I ask that you reverse this conviction. Thank you very much. We will issue a decision in due time and we will be in recess until 9.30.